# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE,<br>c/o Institute for Constitutional<br>Advocacy and Protection<br>Georgetown University Law Center<br>600 New Jersey Ave NW<br>Washington, DC 20001<br><br>    *Plaintiff,*<br><br>**vs.**<br><br><br>THE FEDERAL DEPOSIT INSURANCE<br>CORPORATION,<br><br>   and<br><br>JONATHAN MCKERNAN, in his<br>official capacity as Director of FDIC,<br>550 17th Street NW<br>Washington, D.C. 20429<br><br>    *Defendants.* | **Complaint**<br><br>Civil Action No. _____ |

## **COMPLAINT**

1.    Plaintiff Dr. John Doe[1] is 51 years old and has served the federal government in various positions, including those requiring a security clearance, for more than 15 years. Because of the statutory bar of 12 U.S.C. § 1822(f)(4)(E)(i), the Federal Deposit Insurance Corporation ("FDIC" or "the Agency") rescinded its offer of employment to Dr. Doe based on expunged, non-violent felony convictions from when he was a teenager. This draconian

---

[1] Dr. Doe has filed a Motion to Proceed Pseudonymously simultaneously with this Complaint. As that Motion explains, given the sensitive and private nature of the information about Dr. Doe's expunged convictions in this Complaint, he asks that this Court allow him to pursue his claims under a pseudonym.

statutory provision targets an already disadvantaged group—those with prior felony

convictions—with no rational basis.  It is therefore unconstitutional.

2.      Specifically, 12 U.S.C. § 1822(f)(4)(E)(i) "prohibit[s] any person who has—

(i) been convicted of any felony;
…
from performing any service on behalf of the [FDIC]."

In other words, any person previously convicted of any felony at any time cannot obtain work at

the FDIC.

3.      Categorical, life-long felony-conviction bans like the one in 12 U.S.C.

§ 1822(f)(4)(E)(i) are unjustified by any governmental need.  A categorical ban that disallows

any consideration of the gravity and circumstances of the offense, when the conviction occurred,

or the extent of the person's rehabilitation bears no reasonable relationship to any governmental

interest in hiring trustworthy workers.  Many people subject to such categorical bans have put

their convictions far behind them.  They have paid their debts to society and gone on to live

productive, law-abiding lives, to the point that they are no more likely to commit infractions at

work than anyone else.  Barring those individuals from employment serves no purpose.

4.      Categorical felony-conviction bans also inflict devastating consequences on

people with felony convictions.  By denying economic opportunity to formerly incarcerated

individuals seeking to reintegrate into society, such bans contribute to cycles of unemployment,

poverty, and reincarceration.  They hurt the national economy by leaving qualified individuals

unemployed or underemployed.  They send a deeply stigmatizing message by deeming the more

than 19 million people in America with felony convictions unworthy to work.  They prolong

punishment endlessly, even after a criminal sentence has been fully served.  And due to

2

staggering disparities in rates of conviction and incarceration, each of these harms falls most heavily on Black individuals and Black communities.

5.      Dr. Doe in this case is a prime example of just how irrational and harmful Section 1822(f)(4)(E)(i) is.

6.      In 1992 and 1993, Dr. Doe was convicted of non-violent felonies he committed as a teenager.  In 2009, in recognition of his complete rehabilitation, Dr. Doe was pardoned by the state of Ohio, and all records of his convictions were expunged.

7.      Dr. Doe is also a longtime employee of the federal government, an educator, and a devout member of his church.  He put himself through college, graduate school, and a doctorate program.  He has held positions of trust within the federal government for more than 15 years--including positions requiring a security clearance—working = for the Department of Homeland Security ("DHS"), the Internal Revenue Service ("IRS"), and the U.S. Bankruptcy Court.  In recommending him for a clearance, an Ohio state representative described Dr. Doe as "a trustworthy man, someone I would be comfortable with handling classified information with the greatest discretion."  He has also received glowing reviews throughout his career, including a letter of recommendation from a U.S. Bankruptcy Court judge emphasizing that Dr. Doe is "a good person" who is "earnest, bright, and articulate" and has demonstrated "a dedication to working hard and to making a contribution to the office within which he is employed."  Dr. Doe has served as an adjunct professor and dissertation chair for various doctoral programs and founded a business to mentor graduate students, veterans, and executives.

8.      In 2022, Dr. Doe applied for a position as a Records System Specialist with the FDIC.  Given his skills and qualifications, the FDIC was quick to offer Dr. Doe the position.

3

Upon learning of Plaintiff's long-pardoned and expunged convictions, however, the FDIC revoked its offer of employment.

9.      The FDIC's sole basis for revoking the offer to Dr. Doe was the conviction ban codified in Section 1822(f)(4)(E)(i).  This blanket, lifelong ban foreclosed the FDIC from taking into account how long ago Dr. Doe's conviction occurred, the circumstances of the offense, how he had rehabilitated himself, or that the conviction was expunged.

10.     To Dr. Doe's knowledge, no other federal agency or department is subject to such a statutory restriction.  This permanent, categorical ban on employing those who have been convicted of a felony is out of step with social science research, federal government policy, and the laws of most states.

11.     Section 1822(f)(4)(E)(i)'s categorical felony conviction ban is unconstitutional in multiple ways.  First, the Fifth Amendment guarantees that similarly situated individuals will be treated equally.  Where laws distinguish between individuals, that distinction must be, at minimum, rational.  Section 1822(f)(4)(E)(i) treats similarly situated individuals differently without any rational basis for distinguishing between them.  This is especially true given that the statute precludes any consideration of the applicant's fitness to perform the job, the gravity and circumstances of the offense, the time since it occurred, or the applicant's rehabilitation.

12.     Second, Section 1822(f)(4)(E)(i)'s categorical felony conviction ban violates the constitutional guarantee of substantive due process.  The Fifth Amendment requires that regulations on entry into a profession be rationally related to a prospective employee's fitness or capacity to work in that profession.  There is no such rational basis here.

13.     Finally, the irrebuttable presumption set by Section 1822(f)(4)(E)(i) that individuals convicted of felonies are unfit to work for the FDIC violates the procedural

components of the Fifth Amendment right to due process of law.  The FDIC provides no opportunity for a person convicted of a felony to challenge this presumption, and the agency is statutorily prohibited from considering the nature of the prior offenses, any pardon and/or expungement of the convictions, or evidence of rehabilitation.

14.     This Court should conclude that the ban on employing individuals at the FDIC who have ever been convicted of any felony is unconstitutional.

15.     Dr. Doe also seeks damages, costs, and fees under Section 604 of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681b(b)(3).  FCRA provides that "before taking any adverse action based in whole or in part" on a consumer report, "the person intending to take such adverse action shall provide to the consumer to whom the report relates–

(i)     a copy of the report; and

(ii)     a description in writing of the rights of the consumer."

16.     Under FCRA, Dr. Doe was entitled to receive a copy of the background report through which the FDIC learned about his expunged convictions.  The FDIC acknowledged that it rescinded Dr. Doe's offer of employment based exclusively on information it obtained through that report, but it refused to provide him with a copy of the background report even after he requested it.  Because of the FDIC's willful violation of the law, Dr. Doe was deprived of a critical opportunity to read and respond to the negative information the report contained.

## JURISDICTION AND VENUE

17.     This action seeks declaratory and injunctive relief against an Act of Congress that violates the Constitution of the United States.  It further seeks damages, costs, and fees under a federal statute.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337(a), 12 U.S.C. §§ 1819(a) & (b)(2)(A), and 15 U.S.C. § 1681p.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because a substantial part of the events giving rise to the claim occurred in Washington, D.C.

**PARTIES**

19.     Dr. Doe is a resident of Maryland.  In 2022, he received an offer of employment from the FDIC, which the Agency later rescinded.

20.     The FDIC is an agency created by Congress that insures and supervises banks and savings associations for operational safety, financial soundness, and compliance with consumer protection laws.  The FDIC has around 6,000 employees in a variety of positions, including bank examiners, compliance examiners, economists, financial analysts, contract reviewers, interpreters, IT professionals, administrative professionals, and attorneys.

21.     Jonathan McKernan is the Director of the FDIC.  He is sued in his official capacity.

**FACTUAL BACKGROUND**

**A.     Dr. Doe's Felony Convictions and Rehabilitation**

22.     Dr. Doe is a 51-year-old Black man who, despite his long history of successful employment in the federal government, was automatically deemed ineligible for a job at the FDIC based on 30-year-old convictions.

23.     In 1992 and 1993, Dr. Doe was convicted of non-violent felonies committed while he was a teenager.

24.     Between 1993 and 1995, Dr. Doe served a two-year prison sentence for those crimes.

25.     Since his release in 1995 at the age of 22, Dr. Doe has been a model citizen.  He has had no other arrests or convictions and has worked diligently to improve himself through education, community service, religious practice, and a commitment to his professional goals.

6

26.     In 2000, Dr. Doe obtained his Bachelor of Arts degree in Paralegal Studies with honors.  He completed his degree while also working for his university's Director of Financial Aid.

27.     After receiving his degree, Dr. Doe worked as a paralegal for several law firms in the Washington metropolitan area.  During this time, he volunteered for several years at the National Capital Area Paralegal Association.

28.     In 2002, Dr. Doe obtained his Master of Public Administration degree, again graduating with honors.  He then served as an adjunct instructor in a legal education program, teaching legal research, legal writing, and other courses, while continuing his work as a paralegal.

29.      In 2008, Dr. Doe was hired as the Deputy in Charge of Operations at the U.S. Bankruptcy Court for the District of Columbia.  He received a glowing reference letter from then-Judge S. Martin Teel, Jr., with whom Dr. Doe worked closely.

30.     Beginning in 2009, Dr. Doe worked as a Management Analyst for the IRS Chief Counsel.

31.     While working for the federal court system and the IRS, Dr. Doe continued attending school.  He obtained his Doctorate in Business Administration, graduating with a perfect 4.0 GPA.

32.     In 2011, Dr. Doe was hired as a Senior Advisor of Records Information Governance at a component of DHS.  Dr. Doe disclosed his prior convictions to DHS when he applied.  Despite his convictions, he was hired.  Dr. Doe received a Merit Award for his work in big data and information management while at DHS.

33.     While employed by DHS and after an extensive background check, Dr. Doe obtained a security clearance at the Secret level.  That security clearance provided access to sensitive information that can cause serious damage to national security if disclosed without authorization.

34.     In 2019, Dr. Doe became a Program Manager in a different component of DHS and was subsequently promoted to a senior records official position.  In that role, Dr. Doe oversaw the component's records management program, ensuring that it complied with federal guidelines for the preservation of records.

35.     Dr. Doe also received an advanced certification as a Contracting Officer's Representative, which allowed him to be assigned to the most complex, critical risk, and mission critical contracts within the agency.  In connection with this certification, Dr. Doe oversaw millions of dollars in contracts for his DHS component.

36.     While he was at DHS, Dr. Doe's Secret-level security clearance was renewed following DHS's standard five-year reinvestigation process.

**B.     Expungement of Dr. Doe's Conviction**

37.     In 2009, upon the unanimous recommendation of the Ohio Parole Board, Ohio Governor Ted Strickland pardoned Dr. Doe for his felony convictions.  The Parole Board described the pardon as "highly warranted" given Dr. Doe's "total acceptance of responsibility and expression of remorse," along with his "demonstration of good citizenship."  It emphasized that Dr. Doe's convictions had been "an impediment to pursuing employment in his chosen field" and that a pardon would "allow him to securely pursue his career."  Governor Strickland concurred, explaining that "[a]fter careful and diligent examination of the totality of the materials

available to me, I believe that [Dr. Doe] has demonstrated that he has been rehabilitated and has assumed the responsibilities of citizenship.  A full and unconditional pardon is warranted."

38.     Under Ohio law, "[a]n unconditional pardon relieves the recipient of all disabilities arising out of the convictions for which it is granted."  Ohio Rev. Code Ann. § 2967.04(B) (2023).  Put differently, "a full pardon purges away all guilt and leaves the recipient from a legal standpoint, in the same condition as if the crime had never been committed."  *State ex rel. Gordon v. Zangerle,* 26 N.E.2d 190, 194 (Ohio 1940).

39.     Accordingly, in 2010, the Ohio Court of Common Pleas expunged Dr. Doe's criminal records and declared that Dr. Doe's convictions "shall be deemed not to have occurred."

**C.     The FDIC Rejection**

40.     In 2022, Dr. Doe applied to be a Records Systems Specialist in the Records and Information Management unit at the FDIC.  In this role, Dr. Doe's responsibilities would have included ensuring that the Agency maintained its records in accordance with federal guidelines.

41.     Based on his excellent qualifications, the FDIC selected Dr. Doe for the position and extended a conditional job offer.

42.     The FDIC subsequently conducted a background check through TLO, a commercial investigative service provided by TransUnion.  That report identified Dr. Doe's expunged felony convictions.  About a week after the job offer, Dr. Doe received an email from the FDIC seeking further information about his convictions.  The email required a response on the same day.

43.     The FDIC did not provide or offer to provide Dr. Doe with a copy of the background check.  Indeed, it did not provide Dr. Doe with any documentation or records about the convictions at all and did not explain where it had obtained information about the convictions

beyond a general reference to "preliminary background checks."  Dr. Doe requested the source

of the FDIC's information and contact information for the entity reporting his expunged criminal

history, but the Agency refused to provide that information to him.   Dr. Doe had no opportunity

to review the FDIC's records while formulating his response.

44.     Nevertheless, Dr. Doe responded to the FDIC's request immediately, providing

information about his past convictions and explaining to the agency that the convictions had been

pardoned and expunged over a decade earlier.

45.     Despite Dr. Doe's ample experience and qualifications, the FDIC rescinded its

offer of employment by letter a week later.  The letter stated that "[a] review of the information

provided during your background investigation has raised derogatory issues which could not be

mitigated," and that the offer of employment was withdrawn "[b]ased on the severity of these

issues."

46.     Dr. Doe responded, asking the FDIC to provide him with information on the

procedures for appealing the decision to withdraw his offer of employment.  The Agency did not

provide Dr. Doe with any avenue for appealing the decision.

47.     Dr. Doe later learned through Agency documents that FDIC officials had agreed

that due to "mitigating factors," including the time that had passed since his convictions and his

rehabilitation, he should be hired despite his conviction record.

48.     FDIC's legal department, however, refused to approve Dr. Doe's employment.

49.     FDIC subsequently confirmed, in a separate legal proceeding, that Dr. Doe's

conviction record was the sole reason that his job offer was revoked, writing that Dr. Doe's:

> tentative offer was rescinded because a federal statute prohibits the FDIC from
> employing any person who has "been convicted of any felony." 12 U.S.C.
> § 1822(f)(4)(E)(i); *see also* 12 C.F.R. § 336.4(a)(1) (no person shall become
> employed by the FDIC who has "[b]een convicted of any felony.").

10

50.     This rejection harmed and continues to harm Dr. Doe.  It caused and continues to cause Dr. Doe to experience bouts of depression and to worry that others will learn of his expunged, pardoned convictions, which could further damage his career, his reputation, and his mental health.

51.     It also caused Dr. Doe significant alarm and anxiety to find out that his pardoned and expunged convictions showed up on a background report.  Given that Ohio's pardon and expungement processes are designed to leave the recipient in the same condition as if the crime had never been committed, Dr. Doe has a significant privacy interest in making sure that his expunged convictions are not inappropriately revealed.  Not having access to the background report that the FDIC obtained, and therefore being denied information about how and by whom his expunged convictions were reported, undermined this interest and caused Dr. Doe immense concern.

52.     Since his convictions were pardoned and expunged, Dr. Doe has expended extensive effort and expense to ensure that they are no longer part of his record.  That includes paying for monitoring services and requesting an Identity History Summary from the FBI to find out what criminal history data the FBI had on file about him.

53.     Dr. Doe estimates that in the time since the FDIC notified him that his convictions appeared in a background report, he has spent about 32 hours attempting to identify the source of that information and have that information removed.  He also estimates that he has spent over $1850 on therapy, background monitoring, and legal consultations in that time.

54.     Dr. Doe plans to continue working for the federal government for the remainder of his career.  Because of his long-expunged felony convictions, however, Dr. Doe is prohibited from *ever* working at the FDIC, curtailing his options for future employment.

11

### D.     FDIC Hiring Restrictions

55.     In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") to "reform, recapitalize, and consolidate the Federal deposit insurance system, to enhance the regulatory and enforcement powers of Federal financial institutions regulatory agencies," and for other purposes.  H.R. Rep. No. 101-54, pt. 1 at 1 (1989).

56.     FIRREA included a requirement that the Resolution Trust Corporation ("RTC") prohibit any person who had been convicted of a felony from being employed by or entering a contract with the RTC.  Pub. L. No. 101-73, § 21A, 103 Stat. at 393.

57.     In 1993, Congress passed the Resolution Trust Corporation Completion Act, which transferred certain duties from RTC to the FDIC.  As part of that transfer, the Act amended the Federal Deposit Insurance Act to subject the FDIC to the same categorical felony conviction ban that previously applied to RTC.  *See* H.R. Rep. No. 103-103, pt. 1, at *21-22 (1993).

58.     The FDIC's categorical felony conviction ban was adopted without debate or testimony.  Nothing in the legislative record of FIRREA or the RTC Completion Act suggests that Congress meaningfully considered or discussed the merits of a lifetime, blanket ban on FDIC employment for anyone ever convicted of a felony.

59.     Under 12 U.S.C. § 1822(f)(4)(E)(i), the FDIC is required to "prohibit any person who has— (i) been convicted of any felony … from performing any service on behalf of the [FDIC]."

60.     The statutory felony conviction ban is categorical.  The Agency has no discretion to consider an applicant's fitness for a job or an employee's ability to perform his job if he has

been convicted of a felony. Nor can the Agency consider any mitigating factors such as the gravity and circumstances of the offense, the time that has passed since the offense, or the applicant's rehabilitation. The Agency also does not consider whether a prior conviction was pardoned or expunged.

61.    This statutory ban on the FDIC's employment of any person convicted of any felony is also codified in agency regulations. These regulations exempt from the categorical felony-conviction ban anyone employed at the agency before June 18, 1994 who has convictions that precede that date.

62.    12 C.F.R. § 336.4(a)(1) states that "[n]o person shall become employed on or after June 18, 1994, by the FDIC or otherwise perform any service for or on behalf of the FDIC who has: [b]een convicted of any felony[.]"

63.    12 C.F.R. § 336.5(a)(1) similarly states that "[n]o person who is employed by the FDIC shall continue in employment in any manner whatsoever or perform any service for or on behalf of the FDIC who, beginning June 18, 1994, and thereafter: [i]s convicted of any felony[.]"

64.    Accordingly, although 12 U.S.C. § 1822(f)(4)(E)(i) imposes a categorical felony conviction ban, under the FDIC implementing regulations, employees hired by the FDIC before June 18, 1994 who have convictions that precede that date are grandfathered into their employment and are not categorically excluded.

### E.    The FDIC Conviction Ban Is Irrational and Serves No Legitimate Purpose

65.    Restrictions on who the FDIC may hire must bear a logical relationship to ensuring that the agency hires workers who are competent and trustworthy. The FDIC has no legitimate interest in categorically and permanently barring people with felony convictions from employment.

13

66.     Studies on the intersection of work and crime have concluded that permanent, categorical felony-conviction bans in employment cannot be justified based on public safety, risk of recidivism, or any other purported interests underlying such bans.  Plainly stated, "[t]here is a consensus that the blanket exclusion of individuals with criminal history records makes little sense."[2]

67.     The category of "felony" is quite broad and, in many states, includes minor offenses like marijuana possession that do not bear any long-term relationship to job performance, competence, trustworthiness, or any other workplace objective.[3]

68.     Permanent, categorical bans are further unjustified because "recidivism risk declines the longer a person lives in a community without a new conviction,"[4] eventually reaching a point at which most people with conviction records are no more likely to commit a new crime than those without records.[5]  Experts estimate that this leveling-off generally occurs after 6-10 years without an offense[6]—far less time than the 30 years that have elapsed since Dr. Doe's offenses.  This is true even of people initially at highest risk of reoffending, such as those with more extensive criminal histories.[7]  While time-limited "statutory restrictions on employment" of individuals convicted of felonies may be a rational policy decision, permanent bans on employment are not.[8]

---

[2] Megan C. Kurlychek et al., *Scarlet Letters and Recidivism: Does An Old Criminal Record Predict Future Offending?*, 5 Criminology & Pub. Pol'y 483, 485 (2006).
[3] Sarah K.S. Shannon et al., *The Growth, Scope, and Spatial Distribution of People With Felony Records in the United States, 1948–2010*, 54 Demography 1795, 1797 (2017).
[4] Shawn D. Bushway et al., *Providing Another Chance: Resetting Recidivism Risk in Criminal Background Checks*, RAND Corporation iii (2022), http://tinyurl.com/263xvcpz.
[5] Shawn D. Bushway et al., *The Predictive Value of Criminal Background Checks: Do Age and Criminal History Affect Time to Redemption*, 49 Criminology 27, 52 (2011).
[6] *Id.*
[7] Bushway, *supra* note 4, at vi.
[8] Kurlychek, *supra* note 2, at 499.

69.     Categorical bans also prevent consideration of other factors that research shows bear on the risk that a person will reoffend.  In addition to the time that has elapsed since a person's last offense, an individual's age and the number of past crimes are both relevant in a risk analysis.  For older individuals and those with less extensive criminal histories, criminal records are less predictive of future crime.[9]  As a result, predictive risk models that allow employers to assess multiple relevant factors when evaluating job applicants with criminal records may be a rational policy decision, but categorical bans on employment are not.[10]

70.     Research also suggests that people with a felony record display the same level of job performance as people without a record.  A study following 1.3 million military employees from 2002 to 2009 found that people with a felony record were no more likely to be discharged for poor job performance than people without a felony record.[11]  Moreover, employees with a felony record advanced through the ranks more successfully than those without a felony record.[12]

71.     The categorical felony-conviction ban for the FDIC's workforce is not only inconsistent with social science but also an outlier.  At the federal level, other monetary and financial agencies, including the Commodity Futures Trading Commission and the Federal Reserve, do not have any mandatory policies or laws that categorically prohibit hiring employees with criminal histories.  Nor do agencies that deal with sensitive and classified information, including DHS and the Department of Defense.

---

[9] Bushway, *supra* note 5, at 52.
[10] Bushway, *supra* note 4, at 3-4.
[11] Jennifer Hickes Lundquist et al., *Does a Criminal Past Predict Worker Performance? Evidence from One of America's Largest Employers*, 96 Soc. Forces 1039, 1050 (2018).
[12] *Id.* at 1050–53.

72.     The Office of Personnel Management ("OPM"), which oversees the federal workforce, has stated that "[p]eople with criminal records are eligible for employment in the vast majority of federal jobs."[13]

73.     As part of the 2020 National Defense Authorization Act, Congress enacted the Fair Chance to Compete for Jobs Act.  The Act prohibits federal agencies and contractors from requesting criminal background information from job applicants before extending an offer, with a few exceptions.  *See* Pub. L. No. 116-92, § 9202, 1363 Stat. 1605, 1606 (2019).  The Act had bipartisan support.  One Republican representative explained in support of the legislation that without such a prohibition, "the 18-year-old who makes a mistake will not only pay for his crime through the justice system, but will continue to be punished for the rest of his life, as he or she is disqualified out-of-hand from consideration for federal employment opportunities, even when qualified for the position."[14]  A Democratic senator agreed, noting that employment decisions based solely on criminal history impose "unreasonable employment barriers that stand in the way of contributing to our workforce."[15]

74.     As part of the 2023 National Defense Authorization Act, Congress enacted the Fair Hiring in Banking Act, 12 U.S.C. § 1829.  The Act amended Section 19 of the Federal Deposit Insurance Act, which had previously prohibited people from participating in the affairs of FDIC-insured institutions if they had been convicted of certain criminal offenses.  The amendments eliminated several barriers to employment for such individuals, including by

---

[13] Office of Personnel Management, *Federal Hiring Mythbusters: What is the federal policy on hiring individuals with criminal records?* (2019), http://tinyurl.com/4fwbzwak.

[14] Sen. Cory Booker, *Booker, Cummings, Johnson, Issa, Members of Congress Introduce Bipartisan Legislation to Give Formerly Incarcerated a Fair Chance at Federal Employment* (Sept. 10, 2015) (statement of Rep. Issa), http://tinyurl.com/ybee3fu2.

[15] *Id*. (statement of Sen. Baldwin).

limiting relevant convictions to those in the past seven years, directing FDIC-insured institutions not to consider most offenses committed by individuals when they were 21 or younger, and excluding from the scope of the prohibition any offenses that have been expunged, sealed, or dismissed.[16]

75.     The committee report described the employment restrictions as "unnecessary" and "unjustified" and explained that the measure helped "prevent discrimination against justice-involved individuals from persisting long after potential employees have served their time." H.R. Rep. 117-314, at 7 (2022).  The Act requires that companies "factor in evidence of rehabilitation, age during time of conviction or probation, and relevance of offense to the position," and it sets a presumption that "an individual is rehabilitated if four years have passed since the offense and there are no other convictions."  *Id*. at 8.

76.     The Fair Hiring in Banking Act enjoyed broad bipartisan support.  One Republican legislator noted that "[j]ust because an individual once committed a crime does not automatically mean that they can never be trusted, nor does it mean that they are unqualified to work in our financial system."  168 Cong. Rec. 4743 (2022) (statement of Rep. Hill).  A Democratic legislator described the prior restrictions as "entirely unnecessary and unjustified barriers to employment for highly qualified individuals who have done their time and who deserve to be given a second chance to reintegrate into society."  *Id*. (statement of Rep. Garcia).

77.     Another member of Congress similarly explained that lifetime bans are ineffective, citing research that "shows that after seven years, someone convicted of a felony is no more likely to commit a new offense than any other person."  168 Cong. Rec. 4744 (2022) (statement of Rep. Beatty).

---

[16] FDIC, *Overview of Key Changes to Section 19* 1-2 (2023), http://tinyurl.com/58czayf4.

78.     The FDIC itself supported the measure.  In a statement, a member of the FDIC Board of Directors noted "a certain irony in the longstanding policy to ban individuals who were convicted of low-level crimes," given the "number of top executives at large banks who have repeatedly presided over consumer abuses, money laundering, and other financial crimes."[17]

79.     As a result of the Fair Hiring in Banking Act, were Dr. Doe to submit a job application to an FDIC-insured financial institution instead of to the FDIC, he would not be categorically barred from employment.  Because he applied to the FDIC itself, however, his application was rejected based on the agency's draconian conviction ban.

80.     In 2022, the White House issued a comprehensive "Incarceration to Employment Strategy" in recognition of the importance of expanding employment opportunities for formerly incarcerated individuals. In that strategy, the White House noted that employment barriers for individuals with conviction records are "harmful to the national economy" and that a "good job and supportive services are not only critical to successful reentry for formerly incarcerated persons, but also to promoting public safety and improving economic well-being in American communities."[18]

81.     The 2022 Strategy further recognized that "[f]ormerly incarcerated persons are an underutilized talent pool despite employers attesting that formerly incarcerated persons are often some of their best and most dedicated employees."[19]  The Strategy urged reform, exhorting employers to

_____

[17] Consumer Fin. Prot. Bureau, *Statement of CFPB Director Rohit Chopra, Member, FDIC Board of Directors, on the Proposed Rule Regarding Lifetime Banking Bans for Certain Criminal Offenses* (Oct. 24, 2023), http://tinyurl.com/ybbvmykz.
[18] The White House, *Incarceration to Employment: A Comprehensive Strategy to Expand Employment Opportunities for Formerly Incarcerated Persons* 2 (April 2022), http://tinyurl.com/2vbk24bs.
[19] *Id*. at 5.

implement . . . inclusive approaches to ensure that their recruiting, hiring, onboarding, and retention policies do not exclude returning community members, knowingly or unknowingly.  Further, employers should ensure their policies provide formerly incarcerated persons a fair chance at quality jobs where they can bring their skills, persistence, and dedication to inclusive work environments.[20]

82.    In 2012, the Equal Employment Opportunity Commission  ("EEOC") released Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions.[21]  The EEOC concluded that "[a] policy or practice requiring an automatic, across the-the-board exclusion from all employment opportunities because of any criminal conduct" is not job related and consistent with business necessity because it "does not focus on the dangers of particular crimes and the risks in particular positions."[22]  The agency advised employers to instead engage in an individualized assessment of the job requirements, the nature of the offense and its relationship to fitness for the work, and the time that had passed since the offense, among other factors.[23]

83.    In September 2023, the associate director of the EEOC's Office of Federal Operations noted that "[a]s the nation's largest employer, the federal government is uniquely positioned to demonstrate how to improve opportunities for this underserved community [of persons with arrests and convictions]."[24]  He explained that "[p]ersons with arrest and conviction records who have rehabilitated and present a low risk for recidivism need opportunities for stable

---

[20] *Id.*

[21] U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2012-1, *Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions under Title VII of the Civil Rights Act* (2012), http://tinyurl.com/2xsw3kr5.

[22] *Id.*

[23] *Id.*

[24] U.S. Equal Emp. Opportunity Comm'n, *EEOC Issues Federal Workforce Reports Focused on Workers With History of Arrest or Conviction* (Sept. 12, 2023), http://tinyurl.com/2pa9cuvs.

employment" and emphasized that "[e]mployment in the federal government may help address some of the barriers these individuals face and ease their reintegration into society."[25]

84.     The private sector, too, has recognized the irrationality of categorical, lifetime felony bans. For example, the CEOs of JPMorgan Chase & Co. and Eaton Corporation chair the Second Chance Business Coalition, a cross-sector coalition of large private-sector firms committed to expanding hiring and advancement practices within their companies for people with arrest and conviction records. The coalition includes a number of prominent financial sector companies, including Bank of America, Mastercard, PayPal, and Visa.

85.     The Coalition makes a business case for hiring individuals with criminal records, explaining that "85 percent of human resource (HR) professionals and 81 percent of business leaders report that individuals with criminal records perform the same as, or better than, employees without criminal records. Furthermore, 82 percent of managers and 67 percent of HR professionals report that the value second chance employees bring to their organization is as high as, or higher than, that of workers without records."[26] As a result, the Coalition concludes, businesses willing to hire individuals with convictions "can tap into an extensive and diverse talent pool that is too often overlooked, while addressing the broader societal need for inclusive economic participation."[27]

86.     In recent years, states around the country have removed categorical bans on employment for people with felony convictions, including through reform of their occupational licensing laws. Because one out of every five Americans needs a license to work in their chosen

---

[25] *Id.*

[26] Second Chance Bus. Coal., *The Business Case for Second Chance Employment* 1 (Sept. 2023), http://tinyurl.com/5ddn94sf.

[27] *Id.* at 2.

field, these changes have increased participation of individuals with criminal records in a range of state-licensed professions.[28]

87.     Since 2015, 40 states have eased licensing barriers for people with criminal records.[29]

88.     Twenty states and the District of Columbia block licensing boards from denying individuals with criminal records a license to work unless the board determines that the applicant's record is directly related to the license sought.

89.     Thirteen states limit boards from considering convictions that happened long ago, with some limited exceptions, usually for violent or sexual felonies.

90.     Eighteen states and the District of Columbia ban the use of annulled, erased, expunged, sealed, or vacated records to disqualify applicants for licenses.[30]

91.     As of 2021, 37 states, the District of Columbia, and over 150 cities and counties have gone even further, adopting policies that require private employers to remove conviction and arrest history questions from job applications.

92.     The above actions by federal and state government actors, as well as the private sector, underscore the fact that permanent, categorical conviction bans are not, and never have been, supported by legitimate governmental interests.

93.     Categorical bans also exact an enormous toll on affected workers and the U.S. economy.  As of 2010, over 19 million individuals in the United States—or about 8.1 percent of

---

[28] *See* Inst. for Just., *State Occupational Licensing Reforms for Workers with Criminal Records*, http://tinyurl.com/htzecf7x (last accessed Feb. 21, 2024).
[29] *See* Inst. for Just., *Barred from Working: A Nationwide Study of Occupational Licensing Barriers for Ex-Offenders*, http://tinyurl.com/yjs9rz7f (last accessed Feb. 21, 2024).
[30] *State Occupational Licensing Reforms, supra* note 28.

the U.S. population—had been convicted of a felony at some point in their lives.[31]  Accordingly, millions of people with felony convictions are in the American workforce today.

94.     As a result of systemic barriers to employment for people with criminal records, including categorical felony conviction bans like the one at issue here, those with felony convictions are less likely to find employment.[32]  They also have an average annual income that is approximately $7,000 less than those without felony convictions.[33]

95.     After incarceration, people with criminal records are subject to a myriad of barriers as they reintegrate into society.  They are often excluded from access to basic life necessities such as housing and work due to their conviction record,[34] trapping families in generational cycles of poverty and incarceration.  High levels of imprisonment also damage communities and neighborhoods, disrupting social ties and increasing crime rates.[35]

96.     Notably, employment is correlated with lower rates of recidivism.[36]  Steady, well-paying employment offers those with convictions "a sense of identity and meaning to their life" and enables them to become economically independent, reducing the incentives for criminal activity.[37]

---

[31] Ryan Larson et al., *Felon History and Change in U.S. Employment Rates*, Soc. Sci. Rsch., March 2022, at 2.

[32] Keith Finlay & Michael Mueller-Smith*, Justice-involved Individuals in the Labor Market since the Great Recession*, U.S. Census Bureau 5 (Sept. 2021), http://tinyurl.com/38547kmu.

[33] *Id*.

[34] Wash. Laws.' Comm. for C.R. & Urb. Affs., *The Collateral Consequences of Arrests and Convictions under D.C., Maryland, and Virginia Law* 5 (Oct. 22, 2014), http://tinyurl.com/yc8hukys.

[35] Dina R. Rose & Todd R. Clear, *Incarceration, Reentry and Social Capital: Social Networks in the Balance* 5 (Dec. 2001), http://tinyurl.com/ykys9k7j.

[36] Mark T. Berg & Beth M. Huebner, *Reentry and the Ties that Bind: An Examination of Social Ties, Employment, and Recidivism*, 28 Just. Q. 382, 387 (2011).

[37] *Id*.

97.     The racial disparities in incarceration and conviction are staggering. The share of

Black adults with felony convictions is nearly three times that of the overall population, or 23

percent.[38]  The rate of felony convictions is even higher for Black men, one-third of whom have

a felony record.[39]  As a result, the cycle of incarceration, exclusion from economic opportunity,

and entrenched inequality is borne disproportionately by Black communities and individuals.

## CLAIMS FOR RELIEF

### COUNT I
### (Violation of Equal Protection Component of the Due Process Clause of the Fifth Amendment)

98.     Dr. Doe incorporates by reference the allegations in all preceding paragraphs.

99.     The Due Process Clause of the Fifth Amendment to the U.S. Constitution includes

a guarantee of equal protection.

100.    Equal protection means that the government cannot arbitrarily or irrationally

subject similarly situated people to different rules.

101.    By categorically banning anyone with a felony conviction from FDIC

employment for life, Defendants violate the Fifth Amendment right to equal protection.

102.    Pursuant to 12 U.S.C. § 1822(f)(4)(E)(i), the FDIC prohibits all those previously

convicted of a felony from employment at the FDIC.  This categorical felony conviction ban

lasts forever, regardless of whether the felony has been pardoned or expunged, the nature of the

offense, the time that passed since the offense, or the potential employee's rehabilitation.

103.    The FDIC must and does adhere to the felony conviction ban, lacking any

discretion to do otherwise.

---

[38] Larson, *supra* at 31, at 2.
[39] *Id*.

104.    The categorical felony conviction ban irrationally discriminates between similarly situated individuals.

105.    The ban draws a distinction between employees and prospective employees convicted of felonies and those not convicted of felonies.  FDIC employees or prospective employees with past felony convictions who are otherwise qualified for employment are similarly situated to FDIC employees or prospective employees without felony convictions who are similarly qualified.

106.    Because Dr. Doe applied to, was qualified for, received, and accepted a position at the FDIC, he is similarly situated to other FDIC employees or prospective employees.

107.    There is no rational basis for this difference in treatment.  As detailed above, no government interest is served by the FDIC's categorical, lifelong felony-ban provision because the ban is not rationally related to fitness to perform the FDIC's work.  Despite the lack of correlation between recidivism and a prior conviction decades after the conviction, the categorical felony-conviction ban irrationally treats people with felony convictions differently from all other job applicants.

108.    Moreover, the ban treats individuals who were previously convicted of felonies and who have been rehabilitated and present no special risk to the FDIC differently from similarly situated individuals who have *misdemeanor* convictions, who are eligible to work for the FDIC.  The categorical felony-conviction ban requires the denial of employment to those convicted of felonies, even if the felony conviction at issue has no bearing on fitness to work for the FDIC.  At the same time, the FDIC has discretion to employ those convicted of misdemeanors even if a conviction might have bearing on the individual's fitness for the job. There is no rational basis for this difference in treatment.

109.    Further, grouping all felonies together ignores the reality of the criminal legal system, in which people who engage in factually identical conduct can and do receive vastly different legal outcomes.  Some who engage in conduct that could be charged as a felony are charged with and/or convicted of only a misdemeanor (or nothing at all) based on charging decisions and plea bargaining.  And given the differences in state and local laws, conduct might be a misdemeanor in one state and categorized as a felony in another jurisdiction.

110.    The categorical felony-conviction ban irrationally discriminates between Dr. Doe and similarly situated groups of people and thus violates the equal protection component of the Fifth Amendment.

111.    The felony-conviction ban, as applied to Dr. Doe, is not rationally related to the work of an FDIC Records Systems Specialist.  Dr. Doe is qualified and fit to work at the FDIC. Dr. Doe has committed no new crimes in decades, has been an exemplary citizen and employee, and has had his convictions pardoned and expunged.

112.    The Records System Specialist role does not require a security clearance, while Dr. Doe has successfully held other positions that required Secret-level clearances.  Dr. Doe has been hired by other federal agencies to work with similarly sensitive information and has maintained the public trust.

113.    Unless Defendants are enjoined from enforcing 12 U.S.C. § 1822(f)(4)(E)(i), Dr. Doe and other similarly situated individuals will suffer continuing and irreparable harm.

## COUNT II
## (Violation of the Due Process Clause of the Fifth Amendment – Substantive Due Process

114.    Dr. Doe incorporates by reference the allegations in all preceding paragraphs.

115.     By categorically banning anyone with a felony conviction from FDIC employment for life, Defendants violate the Fifth Amendment right to due process of law.

116.     Due process has both substantive and procedural components.

117.     The liberty component of the Fifth Amendment Due Process Clause includes the right to engage in a chosen occupation and the right to earn an honest living.

118.     The felony conviction ban violates Dr. Doe's substantive due process rights because it arbitrarily impairs Dr. Doe's liberty interest.

119.     Due process requires that regulations on entry into a profession be rationally related not merely to any legitimate state interest, but specifically to the prospective employee's fitness or capacity to practice the profession.

120.     The FDIC's lifetime, categorical felony conviction ban is not rationally related to the duties of FDIC employees.  As detailed above, no legitimate government interest is served by the ban because the ban is not rationally related to the FDIC's work.  The lifetime, categorical felony-conviction ban bears no relationship to the multitude and diversity of FDIC jobs, which require varying tasks and functions.  Moreover, there is no correlation between recidivism and a prior conviction decades after the conviction.

121.     Unless Defendants are enjoined from enforcing 12 U.S.C. § 1822(f)(4)(E)(i), Dr. Doe and other similarly situated individuals will suffer continuing and irreparable harm.

## <u>COUNT III</u>
## <u>(Violation of the Due Process Clause of the Fifth Amendment – Procedural Due Process</u>

122.     Dr. Doe incorporates by reference the allegations in all preceding paragraphs.

123.     By categorically banning anyone with a felony conviction from FDIC employment for life, Defendants violate the procedural components of the Fifth Amendment right to due process of law.

124.     The categorical felony conviction ban creates a presumption of unfitness for employment at the FDIC.

125.     The FDIC provides no opportunity for a person convicted of a felony to challenge the presumption that the individual is unfit for employment at the FDIC.

126.     In rescinding Dr. Doe's offer of employment, the FDIC was statutorily prohibited from considering the nature and circumstances of Dr. Doe's involvement in the crimes of which he was convicted, the time elapsed since the convictions, the subsequent pardon and expungement of the convictions, his rehabilitation, or his exemplary record for the past 30 years.

127.     The irrebuttable presumption that people convicted of felonies are unfit to work for the FDIC denies them due process.

128.     Unless Defendants are enjoined from enforcing 12 U.S.C. § 1822(f)(4)(E)(i), Dr. Doe and other similarly situated individuals will suffer continuing and irreparable harm.

## COUNT IV
### (Violation of the Fair Credit Reporting Act - 15 U.S.C. § 1681b(b)(3))

1.     Dr. Doe incorporates by reference the allegations in all preceding paragraphs.

2.     Under Section 604 of FCRA, 15 U.S.C. § 1681b(b)(3), any person who uses an individual's consumer report for "employment purposes" and takes "adverse action" against that individual based in whole or in part on the report must send a notice to the individual before taking the adverse action.  That notice must include a copy of the consumer report and a summary of the individual's rights.

3.      The FDIC learned of Dr. Doe's expunged criminal history through a consumer background report provided by TLO.  It rescinded its offer of employment to Dr. Doe based exclusively on this information.

4.      Despite the clear statutory requirement to provide Dr. Doe with a copy of the consumer background report prior to taking this adverse action, the FDIC withheld the report. Dr. Doe was therefore denied the benefit of having access to the report in formulating his response to the FDIC's inquiry about his criminal history.

5.      FDIC's willful failure to comply with FCRA's pre-adverse action disclosure requirements entitles Dr. Doe to actual, statutory, and punitive damages.  He is also entitled to costs and attorneys' fees under the statute.


**REQUEST FOR RELIEF**

Dr. Doe respectfully requests:

A.      A judgment declaring that 12 U.S.C. § 1822(f)(4)(E)(i), is unconstitutional;

B.      A permanent injunction preventing Defendants from enforcing 12 U.S.C. § 1822(f)(4)(E)(i);

C.      Actual, statutory, and punitive damages under FCRA, 15 U.S.C. § 1681n;

D.      An award of attorneys' fees, costs, and expenses per 28 U.S.C. § 2412 and 15 U.S.C. § 1681n; and

E.      Any further relief as this Court may deem appropriate and equitable, including further injunctive and declaratory relief.

Dated:  February 21, 2024                          Respectfully submitted,


                                                   /s/    Joanna Wasik_____

                                                   Joanna K. Wasik (Bar No. 1027916)
                                                   WASHINGTON LAWYERS' COMMITTEE
                                                   FOR CIVIL RIGHTS AND URBAN AFFAIRS
                                                   700 14th St. #400
                                                   Washington, D.C. 20005
                                                   Tel. (202) 319-1000
                                                   Fax (202) 319-1010

                                                   Kelsi Brown Corkran (Bar No. 501157)
                                                   Alexandra Lichtenstein* (Bar No. 1724947)
                                                   Joseph W. Mead* (Bar No. 1740771)
                                                   William Powell (Bar No. 1672707)
                                                   INSTITUTE FOR CONSTITUTIONAL
                                                   ADVOCACY AND PROTECTION
                                                   Georgetown University Law Center
                                                   600 New Jersey Ave NW
                                                   Washington, DC 20001
                                                   (202) 662-9075

                                                   *Counsel for Plaintiff*

                                                   **Application for admission pending*